IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| REBECCA M.SERGENT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL NO. 10-CV-01041 |
| | § | |
| MICHAEL J. ASTRUE | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Pending before the court[1] is Plaintiff's motion for summary judgment (Doc. 21).  The court has considered the motion, all relevant filings, the administrative record, and the applicable law.  For the reasons set forth below, Plaintiff's motion for summary judgment is **DENIED** and Defendant's decision is **AFFIRMED**.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability benefits under Title II of the Social Security Act ("the Act").

### A.  Factual History

### 1.  Plaintiff's Age, Education, and Work Experience

---

[1]  The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgement, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Doc. 11.

Plaintiff was born on March 12, 1943, and was sixty-one years old on June 1, 2004, the amended disability onset date.[1] Plaintiff completed four years of college and received a bachelor's degree in sociology from Texas Southern University in 1978.[2] Prior to her alleged onset of disability, from 1979-2001, Plaintiff worked as a caseworker for Child Protective Services ("CPS") in Houston, Texas.[3] Plaintiff was employed in various clerical capacities before starting her career with CPS.[4]

2.  Medical History

a.  Physical Injuries

Plaintiff's medical records appear generally to support her testimony, although some discrepancies exist relating to the severity of the complaints.

Plaintiff's medical record reflects that she has a history of chest pain, stomach pain, obesity, fatigue, shortness of breath, and headaches dating back to 1992.[5] On March 4, 1999, Plaintiff reported experiencing sharp chest pain when walking.[6] On March 26, 1999, Plaintiff reported shoulder pain, leg pain,

---

[1]   See Tr. 28.

[2]   See Tr. 589-590.

[3]   See Tr. 536.

[4]   See Tr. 536.

[5]   See Tr. 430-476.

[6]   See Tr. 322.

2

back pain, and muscle spasms following an on-the-job accident in which she fell from her chair and hit the side of her desk.[7]

On April 19, 2000, Plaintiff's doctor, Julie Toll, M.D., ("Dr. Toll") diagnosed Plaintiff with stress and chest pain.[8] In a September 9, 2003 assessment, Dr. Toll noted that Plaintiff suffered from tinnitus, chest pain, hypertension, gastroesphageal reflux disease ("GERD"), and high cholesterol.[9] In May 2004, Plaintiff was involved in a motor vehicle accident which exacerbated her leg and back pain.[10]

After examining Plaintiff on June 5, 2003, in response to a complaint about ringing in her ears, Herbert J. Ashe, Jr., M.D., ("Dr. Ashe") told Plaintiff that she had nothing to be concerned about and that she was "healthy otherwise".[11] In an assessment dated June 16, 2004, Dr. Toll noted Plaintiff's uterine fibroids and added atrophic vaginitis to her list of conditions.[12]

In a March 2, 2005 physical evaluation, Dr. Toll again noted that Plaintiff suffered from fibroid tumors, anxiety, and back/leg pain.[13] Plaintiff complained of leg and lower back pain

---

[7]    See Tr. 379.

[8]    See Tr. 91.

[9]    See Tr. 100.

[10]   See Tr. 586.

[11]   See Tr. 101.

[12]   See Tr. 90.

[13]   See Tr. 279.

in an August 3, 2005 examination.[14] On May 6, 2005, she complained of leg cramps, which worsened while she was taking the medication Lipitor.[15]

On January 21, 2006, Dr. Toll conducted a pelvic ultrasound in response to Plaintiff's complaints of pelvic pain.[16] Dr. Toll found multiple uterine fibroids.[17] She also found, however, that Plaintiff's right ovary appeared unremarkable, and that Plaintiff's left ovary could not be seen from the ultrasound.[18]

In a 2007 assessment, Plaintiff's treating physician, Rene Darveaux, M.D., ("Dr. Darveaux") found that Plaintiff was generally well-developed and well-nourished, and that she had no apparent distress.[19] He also found that Plaintiff's lungs were clear to auscultation and percussion, and that her cardiovascular rhythm was regular.[20]

Plaintiff's medical records also show that Plaintiff suffered from obesity.[21] Plaintiff was five feet and two inches

---

[14]     See Tr. 265.

[15]     See Tr. 266.

[16]     See Tr. 251.

[17]     See Tr. 251.

[18]     See Tr. 251.

[19]     See Tr. 552.

[20]     See Tr. 552.

[21]     See Tr. 553-554; see also Tr. 25.

4

tall and weighed approximately 190 pounds.[22] Plaintiff had a body
mass index ("BMI") score of thirty four.[23] According to the
National Institute of Health, an individual is obese if she has a
BMI of thirty or higher.[24] Plaintiff's score placed her in the
"obese" category.[25]

Plaintiff's medical record also shows that she took a
variety of medication for her physical impairments. Starting in
2001, Plaintiff took Triamterne HCTZ Cap 37.5/25 mg, once daily,
for high blood pressure and fluid around the heart area.[26] This
medication made her feel fatigued and required her to lay down
two-to-three times a day.[27] Starting in 2003, Plaintiff took
amlodiphine besylate (generic for Norvasc), once daily, for high
blood pressure and hypertension.[28] This medication also caused her
to lay down two-to-three times per day because it made her feel
fatigued. Starting in 2007, Plaintiff took Vytorin, once daily,
for high cholesterol, and Amitriptyline, once daily, for sleep
and pain.[29] Plaintiff also took Lipitor for high cholesterol,

---

[22]   See Tr. 25.

[23]   See Tr. 197.

[24]   See Tr. 197.

[25]   See Tr. 25, 196.

[26]   See Tr. 76, 191.

[27]   See Tr. 83, 191, 535.

[28]   See 83, 191, 535.

[29]   See Tr. 535.

which occasionally caused her to experience headaches and muscle pain.[30]

Starting in 2002, Plaintiff took Celebrex and Soma daily for her back and leg pain. Plaintiff also took aspirin to help prevent heart attacks, ibuprofen for her back and leg pain, Aleve for back and leg pain, and Tylenol Extra Strength for back, leg, and shoulder pain.[31]

### b. Mental Impairments

There is some evidence in the record of Plaintiff's mental impairments. Symptoms of depression, stress, and anxiety are all noted throughout Plaintiff's medical history.[32] In a June 12, 1995 assessment, Plaintiff complained of experiencing grief following the loss of her two adult sons.[33] Plaintiff's doctor, Donna Sutter, M.D., ("Dr. Sutter") stated that Plaintiff "has lots of anxiety".[34] Dr. Sutter prescribed Klonopin for Plaintiff, and referred Plaintiff for grief counseling.[35]

A medical history and physical exam report from December 28, 1995, noted that Plaintiff suffered from stress, occasional

---

[30]   See Tr. 83.

[31]   See Tr. 72, 74, 191.

[32]   See Tr. 121, 302, 398, 407.

[33]   See Tr. 407.

[34]   See Tr. 407.

[35]   See Tr. 407.

6

headaches, and occasional blurred vision.[36] In this same exam, her treating physician stated that his impression was that Plaintiff suffered from "reactive depression".[37] He also stated that Plaintiff was generally "healthy".[38]

On January 19, 2000, Plaintiff reported experiencing severe headaches and feeling dizzy when she stood from her desk.[39] She told her doctor that these symptoms were the result of stress.[40] In an assessment dated February 11, 2000, Plaintiff claimed to be suffering from depression and stress.[41] She stated that she suffered from crying, that she could not sleep, that she felt nervous and shaky, and that she felt "overwhelmed by daily activities."[42]

The record also indicates that Plaintiff took various medications for anxiety and depression. Her medical records show that she was taking Klonopin and Prozac from at least 1995 through 1999.[43] Plaintiff also took Zoloft following a February

---

[36]   See Tr. 399.

[37]   See Tr. 398.

[38]   See Tr. 398.

[39]   See Tr. 121.

[40]   See Tr. 121.

[41]   See Tr. 302.

[42]   See Tr. 302.

[43]   See Tr. 320-472.

11, 2000 assessment but was not taking it when she filed for disability.[44]

## B. Procedural History

Plaintiff filed for disability benefits on June 2, 2004, claiming an inability to work since September 12, 2001, due to hypertension, GERD, heart disease, fibroids, acid reflux, tendinitis, leg cramps, headaches, ringing in the ears, chest pain, and back pain.[45] During the second administrative hearing, at the advice of her attorney, Plaintiff amended the date of onset to June 1, 2004.[46] Plaintiff was last insured for disability insurance benefits on December 31, 2006.[47]

### 1. The First Administrative Hearing

Plaintiff's claim for disability was denied initially and on reconsideration.[48] On December 10, 2004, Plaintiff timely filed a written request for a hearing before an Administrative Law Judge ("ALJ").[49] Plaintiff appeared and testified at a hearing held on May 18, 2006, in Houston, Texas.[50]

---

[44]  See Tr. 302.

[45]  See Tr. 43, 54.

[46]  See Tr. 613.

[47]  See Tr. 32.  In order to qualify for disability insurance benefits, the claimant must prove that the onset of her disability was on or before the date on which she was last insured. Loza v. Apfel, 219 F.3d 378, 394 (5th Cir. 2000).

[48]  See Tr. 40.

[49]  See Tr. 44.

[50]  See Tr. 610-640.

The ALJ issued an unfavorable decision on June 13, 2006.[51] Plaintiff filed a request for review with the Appeals Council on June 20, 2006.[52] The Appeals Council granted Plaintiff's request for review.[53] In an order dated December 18, 2007, the Appeals Council remanded the case back to the ALJ for further proceedings.[54]

The Appeals Council instructed the ALJ to give further consideration to the limitations resulting from Plaintiff's obesity as required by Social Security Ruling 02-1p, to Plaintiff's maximum residual functional capacity ("RFC"), and to Plaintiff's ability to perform all of the job requirements of a CPS case aide.[55] The Appeals Council also instructed the ALJ to obtain supplemental evidence from a vocational expert to determine whether Plaintiff had acquired any skills that were transferable with very little, if any, vocational adjustment to other occupations under the guidelines in Social Security Ruling 82-41.[56] The Appeals Council stated that the hypothetical questions should reflect the capacity/limitations established by

---

[51]   See Tr. 479.

[52]   See Tr. 503.

[53]   See Tr. 486.

[54]   See Tr. 486.

[55]   See Tr. 488.

[56]   See Tr. 488.

9

the record as a whole.[57] Additionally, the Appeals Council instructed the ALJ that he should identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles ("DOT") and its companion publication, the Selected Characteristics of Occupations.[58]

### 2. The Second Administrative Hearing

In accordance with the Appeals Council's order, the ALJ held a second administrative hearing on March 7, 2008.[59] Plaintiff and Carolyne B. Fisher, a vocational expert, ("VE Fisher") testified at the March 2008 hearing.[60]

### a. Plaintiff's Tesimony

At the hearing, Plaintiff testified that she has a college degree in social work.[61] She stated that she was employed for CPS with the State of Texas from July 1979 through May 2001.[62] Plaintiff's official position was CPS Specialist II.[63] Plaintiff stated that her primary responsibility as a specialist was to

---

[57] See Tr. 488.

[58] See Tr. 488.

[59] See Tr. 22.

[60] See Tr. 22.

[61] See Tr. 621.

[62] See Tr. 621.

[63] See Tr. 622.

provide services to children who were abused.[64] Her duties
included placing the abused children in emergency shelters such
as group homes, foster homes, or hospitals.[65] She also conducted
investigations to see if children were being abused.[66] Plaintiff
also stated that her job duties included entering her case
records into a computer, general filing, and phone work.[67]
Plaintiff testified that approximately eighty-five percent of her
time at CPS was spent in the field.[68]

Plaintiff testified that the medications she took for her
high blood pressure caused her to get tired and sleepy.[69] She said
they forced her to lay down and rest for about an hour after
taking them.[70] Plaintiff also stated that her medications
increased her need to go to the bathroom.[71] She said that when she
took her medications, she would go to the bathroom approximately
once every hour for ten minutes each time.[72]

---

[64]   See Tr. 622.

[65]   See Tr. 623.

[66]   See Tr. 623.

[67]   See Tr. 625.

[68]   See Tr. 627.

[69]   See Tr. 627-630.

[70]   See Tr. 631.

[71]   See Tr. 631-632.

[72]   See Tr. 632.

Plaintiff testified that she had multiple fibroids that caused her pain near the bottom of her stomach.[73] She stated that the pain occurred sporadically throughout the week at five to ten minute intervals, and that the pain could occur during a variety of activities.[74] Plaintiff claimed that she could not work in 2004 because she had severe back and leg problems that made it difficult for her to sit longer than an hour.[75]

Plaintiff testified that she was a Jehovah's Witness and went "out witnessing" about three times a week.[76] These trips involved walking one-to-three blocks and occasional driving by Plaintiff.[77] However, Plaintiff noted that she had recently been making these trips less frequently.[78]

### b. VE Fisher's Testimony

At the same hearing, VE Fisher opined that Plaintiff could not return to her past relevant work because it required her to be outside.[79] VE Fisher stated that there were some transferable skills between Plaintiff's job as a caseworker and other jobs in

---

[73]   See Tr. 632.

[74]   See Tr. 632.

[75]   See Tr. 634.

[76]   See Tr. 593.

[77]   See Tr. 594.

[78]   See Tr. 633.

[79]   See Tr. 636.

12

the national economy.[80] VE Fisher said that Plaintiff would be capable of performing other jobs, semi-skilled in nature, which would include a variety of jobs at the light-to-sedentary level.[81] At the light level, the range of jobs would include general clerk, file clerk, and administrative clerk.[82] At the sedentary level, the jobs would include appointment clerk, information clerk, and customer complaint clerk.[83] The VE stated that Plaintiff's education level would also provide for direct entry into skilled work.[84]

On May 9, 2008, after giving further consideration to the issues identified by the Appeals Council, the ALJ issued an unfavorable decision.[85] In July, Plaintiff appealed the decision.[86] She requested an extension of time to review the hearing tapes and to file a brief.[87] After allowing Plaintiff time to submit additional information, the Appeals Council notified Plaintiff that it had denied Plaintiff's request for review.[88] Thereafter,

_____

[80]   See Tr. 636.

[81]   See Tr. 637.

[82]   See Tr. 636.

[83]   See Tr. 636.

[84]   See Tr. 637.

[85]   See Tr. 19-21.

[86]   See Tr. 17.

[87]   See Tr. 12-16.

[88]   See Tr. 8.

13

the ALJ's decision became the final decision of the Commissioner.[89] Having exhausted all administrative remedies,[90] Plaintiff brought this civil action for review of the Commissioner's decision.[91]

### C. Commissioner's Decision

In his May 2008 decision, the ALJ found that Plaintiff met the requirements for insured status on the alleged onset date of disability and continuing through December 31, 2006.[92] The ALJ also found that Plaintiff had not engaged in substantial gainful activity during the relevant period.[93]

The ALJ found that Plaintiff had a combination of severe impairments, specifically: "chest pains, pelvic pain, back problems, high blood pressure, and obesity."[94] The ALJ noted Plaintiff's alleged symptoms of depression and GERD but found that there was no evidence in the record that documented the severity of those claims.[95]

---

[89]   See Tr. 8.

[90]   See Harper v. Bowen, 813 F.2d 737, 739 (5th Cir. 1987), for a summary of the administrative steps a disability claimant must take in order to exhaust her administrative remedies.

[91]   See Doc. 1, Plaintiff's Original Complaint.

[92]   See Tr. 24.

[93]   See Tr. 24.

[94]   See Tr. 25; see also 20 C.F.R. § 404.1520(c).

[95]   See Tr. 25.

The ALJ found that Plaintiff did not have any impairment, or combination of impairments, that met any listed impairment ("Listing").[96] In reviewing the Listing criteria, the ALJ noted that "obesity" is a severe impairment when, alone or in combination with other medically determinable physical or mental impairments, it significantly limits an individual's physical or mental ability to do basic work activities.[97]

The ALJ found that although Plaintiff's obesity may have affected her condition in relation to her back pain, there was no evidence to indicate that Plaintiff's obesity in conjunction with her back pain met or medically equaled the criteria in the Listing.[98] Additionally, the ALJ found that although Plaintiff's obesity affected her condition in relation to chronic pulmonary insufficiency, her breathing problem had not resulted in cor pulmonale "with mean pulmonary artery pressure greater than 40 mm hg or arterial hypoxemia."[99]  Finally, the ALJ found that there was no evidence in the record that Plaintiff's hypertension had resulted in chronic heart failure while on a regimen of prescribed treatment pursuant to Listing 4.03.[100] He noted that although obesity is often associated with disturbance of the

---

[96]   See Tr.25; see also 20 C.F.R Part 404, Subpt. P, App. 1; 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

[97]   See Tr. 25.

[98]   See Tr. 25.

[99]   See Tr. 25.

[100]   See Tr. 26.

cardiovascular system, the additional and cumulative effects in conjunction with hypertensive cardiovascular disease had not resulted in the severity required by Listing 4.03.[101]

As for Plaintiff's RFC, the ALJ determined that Plaintiff could perform light work with the following additional limitations:

> She is able to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for six hours, and sit for six hours within an eight hour work day. She could occasionally climb stairs and ramps, stoop, kneel, and crouch; never crawl or climb ropes, ladders, or scaffolds. She must be allowed to alternate her sitting and standing positions, and can only work indoors with normal breaks at intervals.[102]

The ALJ found that although Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the RFC assessment.[103]

The ALJ found that based on Plaintiff's RFC for light work with additional limitations, Plaintiff was unable to perform her past relevant work.[104] He noted, however, that Plaintiff had acquired work skills from past relevant work including: oral and written communication skills; a variety of clerical skills that

---

[101]   See Tr. 26.

[102]   See Tr. 26.

[103]   See Tr. 27.

[104]   See Tr. 28.

included typing and filing, compiling reports, writing skills, interviewing skills, and operating a computer; and the use of judgment skills.[105] After considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that Plaintiff had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy.[106]

The ALJ determined that although Plaintiff's additional limitations would prevent Plaintiff from performing the full range of light work, finding Plaintiff "not-disabled" was appropriate given the claimant's age, education, and transferable work skills.[107] Therefore, the ALJ concluded that Plaintiff was not under a disability, as defined in the Act, from June 1, 2004, through the date of his decision.[108] The Appeals Council agreed with the ALJ's May 2008 decision and found no reason to grant Plaintiff's request for review.[109]

## II. Standard of Review and Applicable Law

The Court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) substantial evidence in the record supports the

---

[105]   <u>See</u> Tr. 29.

[106]   <u>See</u> Tr. 29; <u>see also</u> 20 C.F.R. §§ 404.1560(c), 404.1566, 404.1568(d).

[107]   <u>See</u> Tr. 30.

[108]   <u>See</u> Tr. 30; <u>see also</u> 20 C.F.R. § 404.1520(g).

[109]   <u>See</u> Tr. 8.

decision; and 2) the ALJ applied proper legal standards in evaluating the evidence. <u>Waters v. Barnhart</u>, 276 F.3d 716 (5th Cir. 2002); <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999). In addition to the initial disability determination, the Social Security Administration periodically reviews continued entitlement to disability benefits. <u>See</u> 20 C.F.R. § 404.1594(a).

### A. Substantial Evidence

The widely accepted definition of substantial evidence is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." <u>Id.</u> The Commissioner has the responsibility of deciding any conflict in the evidence. <u>Id.</u> If the findings of fact contained in the Commissioner's decision are supported by substantial evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issue de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown</u>, 192 F.3d at 496. In other words,

the court is to defer to the decision of the Commissioner as much as possible without making its review meaningless. Id.

### B. Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the act. Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(a); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [she] has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors;(4) a claimant who is capable of performing work that [she]

has done in the past must be found "not disabled;" and
(5) if the claimant is unable to perform [her] previous
work as a result of [her] impairment, then factors such
as [her] age, education, past work experience, and
[RFC] must be considered to determine whether [she] can
do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994)(paraphrasing 20 C.F.R. §§ 404.1520(a)(4)); 416.920(a)(4)). By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999); Brown, 192 F.3d at 498. If the Commissioner satisfies his step five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested. Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

### III. Analysis

Plaintiff makes two arguments in her motion for summary judgment. First, Plaintiff argues that the ALJ committed reversible error at the fifth step of the sequential analysis by failing to make specific findings regarding Plaintiff's advanced age and the transferability of Plaintiff's skills. Second, Plaintiff argues that the ALJ failed to properly evaluate and develop the record regarding Plaintiff's mental impairment.

### A. Vocational Adjustment

Plaintiff contends that the ALJ committed reversible error by failing to make the specific findings that, according to Plaintiff, are mandated by 20 C.F.R. § 404.1568 during the fifth step of the sequential analysis.[110] Specifically, Plaintiff argues that "when the transferability of skills arises with respect to a claimant of advanced age, the ALJ must present the VE with a hypothetical that asks whether or not the skill is transferable with little or no vocational training or job orientation."[111]

In response, Defendant acknowledges that the ALJ did not specifically ask the VE whether or not Plaintiff's skills were transferable with little or no vocational training or job orientation. Defendant contends, however, that this is at most harmless error because it is clear from the ALJ's decision that he properly considered Plaintiff's age and possible work adjustment in his final decision. Defendant argues that the jobs the ALJ found that Plaintiff could perform require the same skills as those identified as transferable by the VE, and therefore, Plaintiff would need to make little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.

The Social Security Administration's table of medical-vocational guidelines ("Grid Rules") requires that a claimant of advanced age (55 and over), who is at least a high school

---

[110]    Doc. 21, Plaintiff's Motion for Summary Judgment, p. 7.

[111]    Id.

graduate, who previously held a skilled or semi-skilled job that she can no longer perform, but who has the RFC to perform light work, is not to be found disabled if she has job skills that are transferable, but must be found not disabled if she does not. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 202.07, 202.06.

The definition of "transferability", or skills that can be used in other work, is set out in 20 C.F.R. § 404.1568(d) as follows:

(1) *What we mean by transferable skills*. We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs.

(2) *How we determine skills that can be transferred to other jobs*. Transferability is most probable and meaningful among jobs in which—

(i) The same or a lesser degree of skill is required;

(ii) The same or similar tools and machines are used; and

(iii) The same or similar raw materials, products, processes, or services are involved.

(3) *Degrees of transferability*. There are degrees of transferability of skills ranging from very close similarities to remote and incidental similarities among jobs. A complete similarity of all three factors is not necessary for transferability. However, when skills are so specialized or have been acquired in such an isolated vocational setting (like many jobs in mining, agriculture, or fishing) that they are not readily usable in other industries, jobs, and work settings, we consider that they are not transferable.

The Grid Rules also provide some additional restrictions on finding transferability of skills for claimants of advanced ages. For the ALJ to find that an individual of advanced age (55 and over), such as Plaintiff, has skills transferable to skilled sedentary work, there must be little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry. See 20 C.F.R. Subpt. P, App. 2, § 201.00(f). The same is true for individuals approaching retirement age (60-64), such as Plaintiff, who have transferable skills to some light work with a few limitations. See 20 C.F.R. Subpt. P, App. 2, §202.00(f). A plaintiff who meets the criteria of this section is presumed disabled unless she has a "particularly" transferable skill or vocational asset. See Jeffcoat v. Sec'y of Health & Human Serv., 910 F. Supp. 1187, 1194 (E.D. Tex 1995). To rebut the presumption of disability, the ALJ is required to show that the individual has skills, and/or an educational level, that would allow for direct entry into light or sedentary skilled work. Id.

As Plaintiff correctly points out, the Tenth Circuit has held in an unpublished opinion that "[w]hen the transferability of skills arises with respect to a claimant of advanced age, the ALJ must present the vocational expert with a hypothetical that asks whether or not the skill is transferable with little or no vocational training or job orientation." Webster v. Barnhart, 187 Fed. App'x 857, 861 (10th Cir. 2006) (citing Nielson v. Sullivan,

922 F.2d 1118, 1119 (10th Cir. 1993)). According to the Tenth Circuit, the ALJ must "make findings specifically targeted at the level of vocational adjustment needed for [the claimant] to enter potential [identified] positions, as required by 1982 SSR LEXIS 34, Social Security ruling 82-41." Webster, 187 Fed. App'x at 861 (citing Nielson, 922 F.2d at 1119); see also Dikeman v. Halter, 245 F.3d 1182, 1188 (10th Cir. 2001) (holding that the ALJ must make findings on remand about the vocational adjustment required for a claimant who had since reached advanced age to perform other semi-skilled jobs).

In Webster, the court specifically took issue with the ALJ's failure to ask the VE any question designed to elicit information about the level of vocational adjustment that would be necessary for the claimant to perform the jobs of information clerk and appointment clerk, given her past work as a social worker. Webster, 187 Fed. App'x at 862. The court stated that it could not simply uphold the ALJ's ruling on the basis that there was evidence in the record to support his finding that little vocational adjustment would be necessary when the ALJ actually failed to make such a finding. Id. at 863.

Other circuits have also held the ALJ to similar requirements when considering the transferability of skills for an individual of advanced age. For example, in Abbott v. Astrue, the Seventh Circuit remanded the claimant's case so that the ALJ could identify the claimant's acquired work skills and explain

24

why the claimant would need to make "very little, if any, vocational adjustment" to a different job. 391 Fed. App'x 554, 558 (7th Cir. 2010); 20 C.F.R. § 404.1568(d)(4).

The Ninth Circuit held in Renner v. Heckler that a sixty-one-year-old claimant, who, because of pain from heel spurs, was unable to stand for any length of time and could not continue past employment as a sales clerk, could not be expected to perform the jobs of electronics inspector and electronics coil winder, because those jobs did not involve directly transferable skills, and because the claimant had merely demonstrated the aptitudes to perform those jobs. 786 F.2d 1421 (9th Cir. 1986). The court concluded that the ALJ must either make a specific finding of "very little vocational adjustment" or otherwise acknowledge that a more stringent test is being applied which takes into consideration the claimant's age.[112] Id.

Similarly, in Draegert v. Barnhart, the Second Circuit remanded a claimant's case on the grounds that the Commissioner did not carry her burden of showing that the claimant, who was of advanced age, possessed vocational skills that were transferable to other work in the national economy. 311 F.3d 468, 477 (2[d] Cir. 2002). The court took issue with the Commissioner's failure to identify any actual skills acquired by the claimant in her past work that would be transferable and allow for little or no

---

[112]   The court noted in dicta, however, that there was no reason to "require every step of each decisional process to be enunciated with precise words and phrases drawn from relevant disability regulations". Renner, 786 F.2d at 1424.

vocational adjustment. Id. The court explained that the rationale for requiring the Commissioner to identify specific skills possessed by a claimant of advanced age that would provide for direct entry into new work with little vocational adjustment is based on the idea that a person of advanced age has little time to learn a new skill and apply it to a new job, especially if her ability to work has been limited by a medical disability. Id.; see also Weaver v. Sec'y of Health & Human Serv., 722 F.2d 310, 312 (6th Cir. 1983) (explaining that § 201.00(f) requires the Commissioner to show that the disabled person has skills which are directly transferable in order to overcome the presumption of disability).

Notwithstanding determinations made in other circuit courts, the Fifth Circuit has not expressly ruled on this issue and Plaintiff has not provided any case law with binding authority over this court. Nevertheless, as Defendant correctly notes, a case will not be remanded in this circuit simply for the reason that the ALJ did not use "magic words". Hampton v. Bowen, 785 F.2d 1308, 1311 (5th Cir. 1986). Rather, the court will only remand a case if there is no indication that the ALJ applied the correct legal standard. Id. at 1311.

In this case, there is substantial evidence in the record indicating that Plaintiff would need to make very little if any vocational adjustment to the jobs recommended by VE Fisher in terms of the tools, work processes, work settings, or the

industry.   There   is   also   substantial   evidence   in   the   record
indicating  that  the  ALJ  considered  whether  Plaintiff  would  in
fact   need   to   make   any   vocational   adjustment   in   determining
whether  Plaintiff's  acquired  work  skills  were  transferable  to  the
alternative  jobs.   More  importantly,  in  his  written  decision,  the
ALJ   actually   made   a   specific   finding   that   Plaintiff's   age,
education,  and  transferable  work  skills  allowed  for  Plaintiff  to
transition  into  other  jobs  in  the  national  economy  with  the  need
for   very   little,   if   any,   vocational   adjustment.[113]   For   these
reasons,   it   is   clear   that   the   ALJ   applied   the   correct   legal
standard.

The   ALJ   found   that   Plaintiff   had   acquired   a   variety   of
transferable  skills  from  her  past  work  as  a  social/caseworker
including:  oral  and  written  communication  skills;  a  variety  of
clerical   skills   that   included   typing   and   filing,   compiling
reports,  writing  skills,  interviewing  skills,  and  operating  a
computer;  and  finally  the  use  of  judgment  skills.[114]  These  findings
are  substantiated  not  only  by  VE  Fisher's  testimony,  but  also  by
Plaintiff's  own  testimony  in  which  she  discussed  her  prior  work
duties,   which   included:   typing   up   reports,   conducting
investigations  over  the  phone,  and  doing  her  own  filing.[115]   The
record  also  shows  that  all  of  Plaintiff's  employment  positions

---

[113]    <u>See</u> Tr. 25.

[114]    <u>See</u> Tr. 24.

[115]    <u>See</u> Tr. 622-628.

prior to her employment as a caseworker involved "clerical duties."[116]

The ALJ found that Plaintiff's skills, as discussed above, would be transferable to the light jobs of a general file clerk, a file clerk, and an administrative clerk, and the sedentary jobs of an appointment clerk, information clerk, or customer clerk.[117]

In part, the ALJ found transferability because all of the jobs identified by VE Fisher require the same skills that VE Fisher claimed were transferable from Plaintiff's prior work experiences.[118] According to the DOT, the general file clerk requires limited knowledge of systems or procedures and is responsible for a variety of "clerical duties" such as: writing, typing, or entering information into a computer, using a keyboard to prepare correspondence, bills, statements, receipts, checks or other documents, copying information from one record to another, and answering phones. See DOT 209.562-010. An appointment clerk "schedules appointments with employer or other employees for clients or customers by mail, phone, or in person, and records time and date of appointment in appointment book." See DOT 237.367-010. An administrative clerk compiles and maintains records of business transactions and office activities of the establishment and performs a variety of clerical duties, which

---

[116]  See Tr. 536.

[117]  See Tr. 636.

[118]  See Tr. 636.

28

are similar to those of general office clerk. See DOT 219.362-010.

The ALJ also found that Plaintiff would be able to transition to new work with little vocational adjustment because of Plaintiff's higher educational background.[119] Plaintiff completed high school and earned a bachelor's degree in sociology from Texas Southern University.[120] The ALJ concluded that Plaintiff's education level would provide for direct entry into the jobs recommended by VE Fisher.

The following excerpt from the second administrative hearing evinces the ALJ's consideration of Plaintiff's education and age in relation to her necessary vocational adjustment. It also shows that the ALJ took into account the special rules regarding individuals of an advanced age:[121]

> **ALJ:** Will her education level also provide for direct entry into skilled work?
> **VE:** Yes, sir.
> **ALJ:** I need new glasses
> **VE:** Is it 202?
> **ALJ:** 202 [INAUDIBLE]. Questions for the VE, Mr. Dewberry?
> **ATTY:** Yes, just, were you looking at a rule your honor?
> **ALJ:** I was looking at 202, the footnotes to 202.
> **ATTY:** Oh, okay.
> **ALJ:** Because --
> **ATTY:** All right
> **ALJ:** -- the reason was because, you know, 201 and 202 after age 55 there's special rules.

---

[119]   See Tr. 28, 637.

[120]   See Tr. 619.

[121]   See Tr. 638.

> **ATTY:** Right.
> **ALJ:** Much more, in the sedentary they're much more
> strict than in the light because the light, you look to
> make sure you have vocationally relevant state industry
> thinks that was the light that's kind of a requirement
> for sedentary. It is a requirement industry, basically,
> we're looking for little if any vocational--
> **ATTY:** Adjustment, yeah.[122]

Clearly, the ALJ was concerned with Plaintiff's age and her

ability to adjust to a new work environment with little or no

vocational adjustment.

But despite the overwhelming evidence in the record

establishing Plaintiff's ability to transfer her skills to the

jobs suggested by VE Fisher with little or no vocational

adjustment, the most convincing evidence that the ALJ has

satisfied his burden and applied the correct legal standard on

this issue actually comes from the ALJ's final decision. In his

written decision, the ALJ specifically found that Plaintiff had

acquired work skills from past relevant work that would allow for

direct entry into new positions that were available in the

national economy.[123] He concluded that, "considering [Plaintiff's]

age, education, and transferable work skills, a finding of 'not

disabled' is appropriate under the framework of Medical-

Vocational rule 202.07, section 202.00(f) of the Medical-

Vocational Guidelines, and 20 C.F.R. § 404.1568(d)."[124]   By

---

[122]    <u>See</u> Tr. 29-30

[123]    <u>See</u> Tr. 29.

[124]    <u>See</u> Tr. 30. Section 202.00(f) of the Medical-Vocational Guidelines
says that for a finding of transferability of skills to light work for
individuals of advanced age who are closely approaching retirement age (age 60-
64), there must be very little, if any, vocational adjustment in terms of the

referencing § 202.00(f), the ALJ demonstrated that he in fact considered Plaintiff's age and found that little or no vocational adjustment would be necessary.

Because the ALJ found that Plaintiff would not require any adjustment in terms of the tools, work process, work settings, and industry, and because there is substantial evidence in the record to support this finding, the court finds that the ALJ applied the correct legal standard in finding Plaintiff not disabled at step five.

### B. The ALJ's Duty to Develop the Record

In her second issue, Plaintiff argues that the ALJ failed to properly evaluate and develop the record regarding Plaintiff's mental impairment. The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits. <u>Ripley v. Chater</u>, 67 F.3d, 552, 557 (5th Cir. 1995). Reversal of the Commissioner's decision is appropriate only if Plaintiff can show that she was prejudiced in some way. <u>Id.</u> Prejudice can be established by showing that, had the ALJ adequately performed his duty, he "could and would have adduced evidence that might have altered the result." <u>Kane v. Heckler</u>, 731 F.2d 1216, 1220 (5th Cir. 1984). In other words, Plaintiff must show that absent the error, the ALJ might have reached a different conclusion. <u>Ripley</u>, 67 F.3d at 557 n.22.

Plaintiff suggests that the ALJ failed to probe adequately

---

tools, work processes, work settings, or the industry.

into the factual issue of the severity of her mental impairments. Plaintiff argues that she has a long history of depression and anxiety, which she says is well documented throughout her medical history. She claims that ALJ failed to properly evaluate these impairments. Plaintiff however does not specifically allege that she has been "prejudiced" in any way.

Contrary to Plaintiff's contention, the record shows that the ALJ considered Plaintiff's depression.  He found that there was no evidence in the record that chronicled the severity of Plaintiff's claims.[125] This finding is supported by substantial evidence in the record.

In her disability application, Plaintiff did not allege to suffer from depression or any other mental impairment.[126] Plaintiff's medical records from June 1, 2004, through December 31, 2006, the relevant period of disability, contain no signs or complaints of severe mental impairment or depression.[127] In fact most, if not all, of Plaintiff's medical history regarding mental impairments dates prior to her leaving her employment at CPS.[128] Plaintiff also did not mention having any mental impairment when she was questioned by the ALJ at either administrative hearing.[129]

---

[125]    See Tr. 25.

[126]    See Tr. 54, 77.

[127]    See Tr. 198-476.

[128]    See Tr. 198-476.

[129]    See Tr. 583-640.

Plaintiff only mentioned her stress as a causation factor in relation to her chest pains.[130]

The court recognizes that Plaintiff has been prescribed medications such as Prozac and Klonopin in the past for conditions such as anxiety, stress, and depression.[131] Plaintiff, however, was no longer taking these medications when she filed for disability in 2004.[132] She also did not mention any of these medications during the administrative hearings when she was questioned about her medication history.[133]

While there is some evidence in the record documenting Plaintiff's history of mental impairments, there is also more than enough evidence to support the ALJ's finding that Plaintiff's depression was not severe. In this case, the ALJ considered over 300 pages of medical evidence before rendering his decision. He solicited information at the first administrative hearing from the medical expert who did not express any concern with Plaintiff's mental condition.[134] Plaintiff's attorney also never mentioned Plaintiff's mental impairments as a source or factor of her disability. Plaintiff simply does not and cannot show that the ALJ gave improper weight

---

[130]   See Tr. 596.

[131]   See Tr. 88-128; 198-476.

[132]   See Tr. 47-49; 70-77.

[133]   See Tr. 583-640.

[134]   See Tr. 599.

to Plaintiff's scarcely documented mental impairments, nor can Plaintiff show that obtaining additional evidence here would have led to finding that her depression or mental impairment was severe. Accordingly, having exhausted all of Plaintiff's arguments, the court DENIES Plaintiff's motion for summary judgment.

### IV. Conclusion

For all of the foregoing reasons, the court **DENIES** Plaintiff's motion for summary judgment and **AFFIRMS** Defendant's decision.

SIGNED at Houston, Texas, this 1st day of August, 2011.

Nancy K. Johnson
United States Magistrate Judge

34